**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA          :

      v.                               :          **Criminal Case No. 08-CR-121 (RJL)**

TIMOTHY L. WILLIAMS              :

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE, STATEMENTS AND OTHER INFORMATION**

The United States, by and through its attorney, the United States Attorney for the District of

Columbia, respectfully submits this opposition to defendant Timothy L. Williams's motion to

suppress physical evidence and statements. In support of its opposition, the United States relies on

the following points and authorities and such other points and authorities as may be cited at a hearing

regarding the defendant's motions:

**Defendant's Current Charges**

The defendant is charged with one count of Unlawful Possession of a Firearm and

Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding

One Year, in violation of 18 U.S.C. § 922(g)(1).

**Factual Background**

I.    **Basis For The Search Warrant**

Metropolitan Police Department Detective Douglas Carlson has been a law enforcement

officer for twelve years. He was promoted to the rank of Investigator in 2001 and to the rank of

Detective Grade II in 2002, and he is currently assigned to the Violent Crimes Branch Homicide

Unit. Having made numerous arrests and interviewed numerous victims, witnesses and suspects in

his career, he requested the issuance of a search warrant for the premises of 1830 Maryland Avenue,

N.E., Apartment #3, Washington, D.C. Detective Carlson requested this warrant, as set forth in a

supporting affidavit, based on his investigation of the defendant, which led him to believe that the defendant: 1) had committed a homicide five short city blocks away from the premises, in front of 1210 19th Street, N.E.; and 2) was storing items related to the homicide at the premises of 1830 Maryland Avenue, N.E., Apartment #3.

As discussed in the affidavit,[1] the homicide being investigated by Detective Carlson occurred on Tuesday, November 1, 2005.  At approximately 5:45 a.m., members of District of Columbia Fire and EMS responded to a vehicle fire  in front of 1210 19th Street, N.E.  The vehicle on fire was a 1999 GMC Yukon.  While extinguishing the fire, they discovered the decedent, Reginald Anthony Holmes, in the rear passenger seat.  He was suffering from multiple gunshot wounds to the head and body.  He was transported to Washington Hospital Center and pronounced dead at 6:26 a.m.  He was then transported to the D.C. Medical Examiner's Office for an autopsy.  The autopsy, which was performed the next day, revealed that the decedent had been shot eleven times.  He suffered two gunshot wounds to the head, and nine gunshot wounds to the lower torso.  The medical examiner recovered five bullet slugs, a piece of flat metal, three bullet fragments, and a piece of fiber material from the decedent.  In the mean time, members of the police department's Mobile Crime Lab recovered twelve .40 Smith and Wesson cartridge casings, six bullet slugs, multiple latent prints, and a latent boot impression from the vehicle and the crime scene.  Three months later, on February 4, 2006, Detective Carlson learned that all twelve casings had been fired from the same firearm, and that all eleven bullet slugs were fired from the same barrel.

In the course of his investigation, Detective Carlson pursued a lead on a suspect known as Vincent Panell.  About three months after the homicide, on February 19, 2006, members of the First

---

[1]        A copy of the affidavit is attached as Exhibit A.

District arrested Panell during a traffic stop, and charged him with Possession with Intent to Distribute Cocaine While Armed. The officers in that case recovered a loaded Glock Model #22 .40 caliber Smith & Wesson handgun from Panell. The police department's Firearm Examination Section determined that this gun was the same firearm that was used to murder the decedent. On March 6, 1996, Detective Carlson obtained a search warrant for Panell's home in an attempt to locate boots or footware that might match the impression left at the scene, clothing and footwear with blood on it, cellular telephones and other devices that could link Panell to the decedent's murder, and items that would tie Panell to the address being searched (e.g., mail matter and photographs). Detective Carlson and other officers executed that warrant on March 7, 2006. Among other things, they recovered cellular phones, a pair of Timberland boots, an additional single Timberland boot, and a pair of blue jeans. Detective Carlson submitted the boots and the pants to the Federal Bureau of Investigation ("FBI") for analysis. As of May of 2006, the FBI could not link these items to the decedent or his murder. Detective Carlson also had Panell's prints compared to the recovered latent prints, and no match was made.

Shortly before Detective Carlson drafted the affidavit which is the subject of the defendant's motion,[2] he interviewed a witness (W-1) who provided information that led to the defendant becoming a suspect in the homicide. As disclosed in the affidavit, W-1 explained that it had information it thought that Detective Carlson should know, although W-1 did not want to be "involved in" or "caught in the middle of" the investigation. W-1 explained that it believed that the

---

[2] The affidavit does not state the date of the interview, but it took place on December 16, 2007. The affidavit is dated March 13, 2008.

defendant was crazy and that if it said too much, the defendant might shoot it.[3]  W-1 described the

defendant as a hard core criminal who would rob people.[4]

W-1 stated that it was a good friend of the decedent and the decedent's family, and that the

decedent was also very good friends with another person, named Reginald Washington, a/k/a

"Roger."  According to W-1, the decedent and "Roger" would hang out near 12th and Jackson Street,

N.E., and ride around in "Roger's" fancy vehicles.  W-1 explained that it hung out in the same area,

and that it would sometimes see the defendant in the area.  On occasions when the defendant

observed the decedent and "Roger" in the area, W-1 would hear the defendant comment on how they

must have money and how he was going to "get at them."  W-1 tried to discourage the defendant

from robbing the decedent, without getting itself hurt, explaining to the defendant that the decedent

was small time and had no money.  A little while after the decedent's murder, W-1 came into contact

with the defendant.  During the conversation, W-1 asked the defendant why "he did that" (meaning

shoot and kill) to the decedent.  The defendant said words to the effect that he was just trying to get

---

[3]    Although not disclosed in the affidavit, W-1 volunteered information about the homicide after it was arrested in the District of Columbia on an outstanding bench warrant issued in a drug distribution case pending in the Circuit Court for Anne Arundel County, Maryland.  During the interview, W-1 specifically said that it was just providing the information to give the decedent's family closure.  W-1 did not ask for assistance with its Maryland case, and none was offered.  W-1 has a lengthy criminal record.

[4]    On March 21, 1995, the defendant pled guilty in two separate cases, Case Nos. CT940823X and CT940824X, in the Circuit Court for Prince George's County, Maryland.  In each case, the defendant was convicted of one count of Robbery with a Deadly Weapon and one count of Use of Handgun in Commission of Felony or Crime of Violence.  On August 3, 1994, the defendant pled guilty to the felony offense of Robbery in Case No. 1993FEL004737, in the Superior Court for the District of Columbia.  That case also involved a gun.

the decedent to take him to "Roger," but the decedent resisted, so the defendant shot him.  After the decedent was shot, he kept resisting, so the defendant shot him some more, and killed him.[5]

During the interview, W-1 referred to the defendant as "Tim," and said that it knew "Tim's" last name, but could not remember it offhand.  W-1 described "Tim" as a dark-skinned black male, six feet tall, who lived in the area of 21st and Maryland Avenue, N.E, who drove a red Chevrolet Monte Carlo and a black Chevrolet Monte Carlo.  W-1 said it could recognize "Tim" from a photograph.  Detective Carlson looked through a police database for arrests in the Fifth District with the first name "Tim."  Assorted "Tims" appeared on the screen, and W-1 pointed to the name "Timothy Williams."  When Detective Carlson clicked on that name and pulled up the defendant's photograph, W-1 identified the defendant as the person about whom W-1 had been speaking.  In running several computer checks on the defendant, Detective Carlson learned that the defendant matched the physical description provided by W-1, that he lived at 1830 Maryland Avenue, N.E., Apartment No. 3, that he possessed a current valid driver's permit associated with that address, and that he once had a Chevrolet passenger car registered to him at that address, back in December of 2005.[6]

In January of 2008, Detective Carlson submitted the defendant's fingerprints for comparison to the recovered latent prints, and there was no match.  Thereafter, on March 13, 2008, Detective

---

[5]       Although not disclosed in the affidavit, the medical examiner explained to Detective Carlson that the decedent died in a manner consistent with the shooting to which the defendant confessed to W-1.  After the decedent was shot about the body, portions of his insides began to enter his circulation.  These pieces stopped circulating only when the decedent was shot in the head and killed.  In other word, the decedent lived for some period of time after he was initially shot.  Of course, the government is not relying on any facts that are not in the affidavit itself with respect to the issue of whether there was probable cause for the search.

[6]       As disclosed in the affidavit, that address is approximately five blocks from the location where the decedent was found.

Carlson presented the warrant affidavit which is the subject of the defendant's motion to Senior Judge Eugene Hamilton of the District of Columbia Superior Court. The detective sought permission to search 1830 Maryland Avenue, N.E., Apartment No. 3, for boots or footware that might match the impression left at the scene, clothing and footwear with blood on it, cellular telephones and other devices that could link the defendant to the decedent's murder, and items that would tie the defendant to the address being searched (e.g., mail matter and photographs).

## II.    Execution Of The Search Warrant

On Wednesday, March 19, 2008, at approximately 7:40 a.m., members of the police department's Emergency Response Team ("ERT"), entered 1830 Maryland Avenue, N.E., Apartment No. 3. The apartment consists of a living room, one bathroom, and one bedroom, and an enclosed porch. The living room is the first room off of the front door, and is furnished with a love seat and a sofa. When the ERT entered, the defendant was standing next to the sofa, and his father was coming into the living room from the bedroom. The officers secured the location, and located an air rifle in the bedroom closet. At that point, members of the Homicide Unit took over the scene. The defendant's father explained that the air rifle belonged to him. The immediate area was secured, and the flex-cuffs on the defendant and his father were removed. The defendant voluntarily went with Detective Carlson and Detective Paul Regan to their office to be interviewed about the basis for the search. After the defendant left, officers continued to search the apartment.

From the bedroom, they recovered mail matter with the defendant's name and the address of the location being searched, and a photograph of the defendant. They recovered two pairs of size ten Timberland boots from the bedroom, and two pairs of size eleven Timberland boots (one from the bedroom closet, and one from the porch). They recovered a Taurus .45 caliber handgun and

assorted .45 caliber ammunition.  The firearm was secreted between clothing inside a laundry bag that was next to the sofa.  They also recovered the laundry bag and the clothing.

In the mean time, the defendant reported to the detectives that he was hungry, and he left their offices to walk to a local Subway shop for lunch.  During this break, the defendant called his father and learned that the police had found a gun.  He never returned to the interview.  The defendant was not arrested immediately.  The police and the government conducted a further investigation, during which witnesses confirmed, inter alia, that the defendant had been staying in the house, that the laundry bag and the clothing inside of it belonged to him, and that none of the other residents of the house possessed a handgun.  The defendant was indicted on April 24, 2008, for one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year.

## III.    **Defendant's Statements**

On April 22, 2008, a Parole Violation Warrant was issued for the defendant.[7]  On April 30, 2008, at 12:20 p.m., the defendant was arrested in the rear alley of 210 17th Street, N.E., Washington, D.C.[8]  He was transported to the Homicide Unit and placed in an interview room at about 1:00 p.m.

The defendant, who is 37 years old and has had extensive contacts with the legal system, was in the interview room for a period of approximately 12.5 hours.  Of the 12.5 hours, he spent about 4.5 hours actually talking with detectives, and another one-half hour talking alone with his girlfriend.

---

[7]    The defendant was on parole in his Maryland and his District of Columbia robbery cases.  This particular warrant issued in his District of Columbia Superior Court case.

[8]    On May 2, 2008, a bench warrant issued for the defendant as a result of the indictment.

During this time period, he was offered and provided food, he was given cigarettes to smoke, he was permitted to sleep, and he was permitted to meet with his girlfriend without officers in the room.

At about 2:15 p.m., and before any questions were asked of him, the defendant stated that he knew he could "kill this shit by asking for a lawyer," but that was not going to do so because Detective Carlson was treating him respectfully.  Again, at about 4:30 p.m., and before any questions were asked of him, he reiterated that he had not asked for a lawyer because he didn't feel he needed one.  He then went on to state that he knew that he was on videotape, that he believed he was a suspect in the murder, and that he was being charged with the gun so that he would discuss the murder.  The detective explained that he would not speak to the defendant about the gun charge (or any parole violations) until he read the defendant his rights.

At about 4:45 p.m., the defendant acknowledged that he had taken no drugs or medication, and Detective Carlson began the process of reading the defendant his rights.  The defendant waived his rights.  This conversation was captured on video, although the defendant then refused to sign the rights card (a "PD-47").

At about 7:00 p.m., the defendant's girlfriend, Kimberly Miles, was permitted in the interview room and left alone with the defendant for about one-half hour.  He again reiterated to her that it is always good to have a lawyer but that he does not need one.  He told her that they were being recorded.

After Ms. Miles left, at about 9:06 p.m., the defendant admitted to Detective Carlson that he did not return to the voluntary interview he had on March 19, 2008, after he called his father and found out that the police had found a gun.  He further stated, "F--- the gun," explaining that he had been shot six times the year before, and that he wished he had a permit to carry one so that would

8

never happen again.  At about 9:17 p.m., while smoking a cigarette, he told detectives that he believed he could get forty years of jail time for having the gun because he was a habitual offender. He further stated that he "knew" the police were telling him "half-truths" to keep him off balance and "pin" something on him, though he did <u>not</u> think they were being "malicious."  He believed the police would let him "go down the tubes" if he did not help them solve the murder.

Shortly after 9:30 p.m., Detective Carlson began to question the defendant more specifically about the gun and the premises.  The defendant said he did not live with his mother but, admitted staying at his mother's house from time to time.  At approximately 9:38 p.m., the defendant admitted that he had purchased the gun six months earlier, and then said that he paid $400 to $500 for it. When he made these statements about purchasing the gun, he complained that Detective Carlson was now bringing up a new line of interrogation, and said he knew he could just "shut the f— up and be quiet."  He nevertheless later went on to say that he got the gun so that the person who shot him would not be able to get to his family.[9]

## Procedural Background

On June 30, 2008, the defendant filed a motion to suppress physical evidence and statements (the "Motion").  With respect to the physical evidence, the defendant generally asserts that the evidence should be should be suppressed because the warrant was based upon insufficient indicia of probable cause, relied on misrepresentation of facts, and neglected to present material facts that negated probable cause.  (Motion at 2.)  The defendant further asserts that the scope of the search exceeded the terms of the warrant, and that the information in the warrant was so stale as to render

---

[9]    Over the course of the interview, he denied <u>carrying</u> the gun, needing to <u>carry</u> a gun to protect himself, or <u>using</u> the gun to commit crimes.

any reliance upon the good faith exception invalid.  (Motion at 2.)  The only facts given by the defendant in support of these broad and specious allegations are: (a) that the homicide occurred "three years"[10] before the warrant was executed, and (b) that the affidavit does not contain any averments of W-1's reliability.  (Motion at 4.)[11]

With respect to the defendant's statements, the defendant argues that the government "bears the burden of pro[v]ing that he was advised of his Miranda rights," and that he knowingly and voluntarily waived them.  (Motion at 5.)  The defendant further argues that his statements were made involuntarily, and urges the Court to "examine the efforts to overbear Mr. Williams' free will in relation to his capacity to resist those efforts."  The defendant offers no facts in support of this allegation.

The defendant's Motion is wholly without merit and should be denied in its entirety.

---

[10]     In actuality, it is two years and four months.

[11]     The defendant also asserts that Detective Carlson did not included the statements made by him during the execution of the search warrant in their prior application for the search warrant.  (See Motion at 1).  The government cannot respond to this argument except to note the obvious chronological impossibility of Detective Carlson doing so.

Given that the Motion does nothing other than generally allege that there were factual misrepresentations, and that the scope of the search exceeded the terms of the warrant, the defendant is not entitled to a hearing on these points.  As such, we have not responded to these broad and vague allegations.  See, e.g., United States v. Thornton, 454 F.2d 957, 967 n.65 (D.C. Cir. 1971) ("An evidentiary exploration is not required as a matter of course, but only upon factual allegations which, if established, would warrant relief."); United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994); United States v. Harrelson, 705 F.2d 733, 737 (5th Cir. 1983); United States v. Migely, 596 F.2d 511 513 (1st Cir.), cert. denied, 442 U.S. 943 (1979); United States v. Poe, 462 F.2d 195, 197 (5th Cir. 1972), cert. denied, 414 U.S. 845 (1973); United States v. Cranson, 453 F.2d 123, 126 (4th Cir. 1971), cert. denied, 406 U.S. 909 (1972); Cohen v. United States, 378 F.2d 751, 760 (9th Cir.), cert. denied 389 U.S. 897 (1967); Grant v. United States, 282 F.2d 165, 170 (2d Cir. 1960).

## Argument

I.    **The Court Should Deny the Defendant's Motion to Suppress Evidence Without a Hearing Because the Warrant is Supported by Probable Cause, the Police Acted in Good Faith Pursuant to the Warrant, and the Defendant Has Failed to Make a Substantial Preliminary Showing that is Required to Mandate a Suppression Hearing.**

### A.    The Affidavit Established Probable Cause for the Search

This Court accords great deference to the judicial officer's determination of probable cause.

See United States v. Johnson, 437 F.3d 69, 71 (D.C. Cir 2006); United States v. Webb, 255 F.3d 890, 904 (D.C. Cir. 2001).  The Supreme Court has admonished lower courts that affidavits for search warrants:

> must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.  A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

United States v. Ventresca, 380 U.S. 102, 108 (1965).  A reviewing court examines only "whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984); United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir 1993).  A judicial officer's task in reviewing a search-warrant affidavit for probable cause "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U. S. 213, 238 (1983).  See also United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (citing Gates).  Thus, "although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the

11

resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." <u>Ventresca</u>, 380 U.S. at 109. Indeed, "[e]ven if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard." <u>United States v. Conley</u>, 4 F.3d 1200, 1205 (3d Cir. 1993).

Evaluated in this deferential light, this affidavit was more than sufficient to establish probable cause under the totality of the circumstances. The affidavit linked the defendant to the murder. According to the affidavit, W-1 was able to describe the defendant by name, physical appearance, type of car he drove, and neighborhood. He also identified the defendant by photograph. According to W-1, he heard the defendant state that he wanted to "get at" the decedent before the murder, and he later heard the defendant confess to committing the murder. The details of this confession were corroborated by the physical evidence. According to the affidavit, the defendant said that after he initially shot the decedent, the decedent kept resisting, and so the defendant had to shoot him additional times to kill him. The autopsy revealed that the decedent had been shot multiple times - nine times in the lower torso and twice in the head. The affidavit also showed a fair probability that evidence of the murder could be found at 1830 Maryland Avenue, N.E. Apartment No. 3. First, those premises were clearly linked to the defendant, both at the time of the homicide and at the time of the search. As stated in the affidavit, the defendant possessed a current valid driver's permit associated with the address, and he had a Chevrolet passenger car registered to him at that address at the time of the homicide. Second, the decedent was found in a burning vehicle just five blocks from those premises. In sum, there is no evidence here that the affidavit on its face was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

None of the defendant's challenges undermines probable cause.  The defendant's allegations of staleness are without merit.  Although the homicide which was the predicate for the warrant had occurred two years and four months before Detective Carlson applied for the warrant, the length of that delay is only one factor in the analysis and does not per se make the affidavit "stale."  See, e.g., United States v. Batchelder, 824 F.2d 563, 564 (7th Cir.1987) (finding probable cause to search for illegal gun silencers despite nine-month delay); United States v. Grandstaff, 813 F.2d 1353, 1357 (9th Cir.) (finding probable cause to search for stolen property despite five-month delay), cert. denied, 484 U.S. 837 (1987).  Such a delay is less significant when, as here, the search warrant lists items innocent on their face (articles of clothing, footware, cellular phones, and documents showing associations between the defendant and the searched residence), as opposed to per se inculpatory items – drugs, guns, stolen property, or other contraband – that probably would remain in a suspect's home for only a short period of time.  See United States v. Johnson, 437 F.3d 69, 72 (D.C. Cir. 2006) ("different kinds of information go stale at different rates").

The defendant's allegation that the affidavit failed to provide averments about W-1's reliability is inapposite.  W-1 is known to Detective Carlson, not anonymous.  W-1 is not an "informant," in the sense that it has not been given any benefit for its information.  Although W-1 had been arrested at the time it was interviewed,  W-1 made it clear to Detective Carlson that it did not want to cooperate with the government, and was not offered any benefit for its information.  In fact, as disclosed in the affidavit, W-1 specifically stated that it did not want to be involved, and merely wanted to provide closure to the decedent's family.  In short, the affidavit relies on the statements of a known but unnamed witness, akin to a citizen witness for whom no recitation of credibility is required.  See, e.g., United States v. Burbridge, 252 F.3d 775, 778 (5th Cir. 2001)

(citizen account of criminal activity is sufficient to establish probable cause); Edwards v. Caberra, 58 F.3d 290, 294 (7th Cir. 1995) (noting that citizen tips are inherently more reliable than anonymous tips); United States v. Scalia, 993 F.2d 984, 987-88 (1st Cir. 1993) ("[A] warrant affidavit [need not contain] an averment of previous reliability, the appropriate inquiry always being whether the informant's present information is truthful or reliable.'"). United States v. Gaviria, 805 F.2d 1108, 1115 (2nd Cir. 1986), cert. denied, 481 U.S. 1031 ("[A] witness to a crime 'need not be shown to have been previously reliable before the authorities may rely on his statements.'"); United States v. Lewis, 738 F.3d 916, 921-22 (8th Cir. 1984) (comparing known witness to informant); 2 Wayne R. LaFave, Search and Seizure, 4th ed., § 3.4(a) at p. 224 ("Most courts have concluded that 'such corroboration is unnecessary' when the reports of one who appears to be an average citizen 'are made upon his personal observation of the commission of a crime.'").

**B.    The Defendant Cannot Overcome the Good Faith Exception to Leon.**

In any event, as a practical matter, following the good faith exception established in United States v. Leon, 468 U.S. 897 (1984), the only challenge a defendant might hope to successfully mount on a search warrant affidavit is that the affidavit contained intentional or reckless misrepresentations or omissions of material fact.  See Franks v. Delaware, 438 U.S. 154 (1978). After Leon, the Court of Appeals made clear that for all practical purposes, a defendant may not litigate a judicial officer's determination of probable cause.  The Court of Appeals has explained:

> So long as the officer relied in objective good faith on the issuing judge's determination, reviewing courts may not apply the exclusionary rule. [Citation omitted.]  As a result, the "degree of police deference to the magistrate which is perceived by courts as reasonable under Leon exceeds significantly that 'great deference' owed the magistrate by reviewing courts under Gates." [Citation omitted.].  The basic rule, in short, is that "the police, having turned the probable cause decision over to another person, . . . are generally entitled to presume that the magistrate knows what he is doing."

United States v. Spencer, No. 06-3091, slip op. at 6 (D.C. Cir. July 11, 2008) (citations omitted).

See also United States v. Geraldo, 271 F.3d 1112, 1116 (D.C. Cir. 2001) ("Under United States v. Leon, [citation omitted], evidence will not be suppressed when a police officer reasonably relies in good faith on a warrant issued by a magistrate, even if the warrant is later determined to be lacking in probable cause."); United States v. Webb, 255 F.3d 890, 904-05 (D.C. Cir. 2001) ("But even if the affidavit were insufficient to establish probable cause, the Supreme Court has held that when police officers obtain evidence through a search incident to a warrant, 'suppression is appropriate only if the officers . . . could not have harbored an objectively reasonable belief in the existence of probable cause.'"); United States v. Salamanca, 990 F.2d 629, 634 (D.C. Cir. 1993) ("even if the affidavit did not sufficiently establish a finding of probable cause, the executing officers justifiably relied in good faith on the magistrate's determination that probable cause existed, which makes the officer's reliance here immune from attack unless the affidavit on which the warrant was based was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'").

In fact, with respect to the exact same issues raised by the defendant, staleness and credibility, the Court of Appeals has explicitly stated:

> There is no possible way for these defendants to overcome United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Supreme Court there assumed that the affidavit in support of the warrant did not supply probable cause because it relied on a confidential informant of unproven credibility; because some of his information was stale; and because the police had not corroborated other information the informant provided. But Leon held that if the officers had gathered evidence in objectively reasonable reliance on the search warrant, the evidence should not be suppressed despite the affidavit's inadequacy. [Citation omitted.]

United States v. Gaston 357 F.3d 77, 80-81 (D.C. Cir. 2004);

In this case, the officers conducting the search had an objectively reasonable belief that a warrant authorized by a judicial officer of the Superior Court for the District of Columbia was properly issued. Thus, their reliance on that judicial officer's determination of probable cause is objectively reasonable, and application of the extreme sanction of exclusion is inappropriate in this case. Absent some information that the Detective Carlson knew that what he was stating in the affidavit was wrong – which is simply not supported by the evidence – there is no basis under Leon to overturn the warrant decision.

**C.    The Court Should Deny the Motion to Suppress Evidence Without a Hearing.**

In order to obtain suppression of evidence seized pursuant to a search warrant assertedly based on a false affidavit, a defendant must show that (1) the affidavit contained false statements or omissions; (2) the statements or omissions were material to the issue of probable cause; and (3) the false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth. Franks v. Delaware, 438 U.S. at 155-56. Before a hearing is required under Franks, the defendant must make a "threshold showing" that the affidavit is false in some material respect:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portions of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Franks v. Delaware, 438 U.S. at 171. See United States v. Gaston, 357 F.3d 77 (D.C. Cir. 2004) (allegations not sufficiently specific to warrant Franks hearing); United States v. Dale, 991 F.2d 819, 843 (D.C. Cir. 1993) (defendants failed to make a substantial preliminary showing that the

government had knowingly, intentionally or recklessly disregarded the truth); United States v. Sobamowo, 892 F.2d 90, 94 (D.C. Cir. 1989), cert. denied, 498 U.S. 825 (1990) (no substantial preliminary showing of intentional or reckless falsehood); United States v. Richardson, 861 F. 2d 291, 293-94 (D.C. Cir. 1988), cert. denied, 489 U.S. 1058 (1989) (declining to decide whether an inaccuracy in a warrant affidavit was material to probable cause in the absence of a contention that it was made intentionally or with reckless disregard for the truth).

Application of the test enunciated in Franks to the facts of this case demonstrates clearly that the defendant has failed completely to make the requisite showing to warrant an evidentiary hearing. The defendant has failed to point out specifically the portion of the warrant affidavit that is claimed to be false, or to provide any supporting statements by witnesses in support such allegation. Because of the defendant's lack of specificity about the claimed falsehood, there is no way to determine whether the absence of the allegedly false statement in the affidavit would negate probable cause or whether the allegedly false statement was made with the requisite knowing or reckless disregard for the truth.

To the extent that the defendant bases his Franks claim on Detective Carlson's omission of "averments of reliability" regarding W-1, the defendant's claim is inapposite. As the Supreme Court specifically provided in Franks, the only "nongovernmental informant" whose credibility is permitted for purposes of challenging the validity of a search warrant is the affiant. Franks, 438 U.S. at 171. See also Dale, 991 F.2d at 843 (holding that "an affiant's failure to disclose the backgrounds and alleged biases of informants does not establish the affiant's reckless disregard for the truth," even though witness (who had been described as a confidential informant) was himself actually under investigation). As discussed above, W-1 is not an anonymous tipster or a government informant,

and there is no evidence that Detective Carlson had a reason or motive to fabricate about the information given to him by W-1.  In any event, a <u>Franks</u> hearing is rarely merited in cases of alleged omissions:

> [W]e reiterate that except in the <u>very</u> rare case where the defendant makes a strong preliminary showing that the affiant <u>with an intention to mislead</u> excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, <u>Franks</u> is inapplicable to the omission of disputed facts.

<u>Mays v. City of Dayton</u>, 134 F.3d 809, 816 (6th Cir.) (emphasis in original), <u>cert. denied</u>, 524 U.S. 942 (1998).  "This is so because an allegation of omission potentially opens officers to endless conjectures about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit."  <u>United States v. Atkin</u>, 107 F.3d 1213, 1217 (6th Cir. 1997)(internal quotation omitted).

Even if this Court were to find that Detective Carlson should have disclosed the circumstances of his interview with W-1, his failure to do so would not constitute a reckless or intentional material omission that would negate probable cause.  It is unlikely that W-1 would provide information about a homicide in the District of Columbia to a detective for the District of Columbia, without any deal on the table, in the hopes that doing so would inure a benefit to W-1 in the Maryland drug case for which W-1 was arrested.  Moreover, Detective Carlson clearly disclosed W-1's more significant potential biases – W-1's close friendship with the decedent, and W-1's opinion that the defendant, who spent time in the same area as W-1, was a "crazy" hard-core criminal who frightened W-1.  Thus, more than sufficient information about W-1's credibility was provided to Judge Hamilton.  <u>See</u> <u>United States v. Pelham</u>, 749 F. Supp. 304, 309 n.5 (D.D.C. 1990) ("the government correctly points out that in this case, because the information was supplied by an

18

eyewitness/victim as opposed to an anonymous tip or a confidential informant, the credibility and reliability requirements are relaxed"). See also United States v. McEachin, 670 F.2d 1139, 1143 (D.C. Cir. 1981) (credibility determination "should be applied with some measure of leniency in cases involving first-hand information from allegedly disinterested persons); United States v. Laws, 808 F.2d 92, 101-02 and n.76 (D.C. Cir. 1986) (citing McEachin). As a detached and neutral judicial officer whose approval of the warrant is subject to deference, Judge Hamilton made a probable cause finding despite the disclosure of those potential biases.

## II.    The Court Should Deny the Defendant's Motion to Suppress Statements without Holding a Hearing.

The defendant made a knowing, intelligent, and voluntary waiver of his Miranda[12] rights after he was arrested on April 24, 2008, and gave his statement voluntarily.[13] The defendant's motion should be denied without a hearing because he has failed to state a single fact to the contrary.

### A.    The Defendant Made a Knowing and Intelligent Waiver of His Miranda Rights.

A Miranda waiver is knowing and valid when "made with a full awareness both of the right being abandoned and the consequences of the decision to abandon it." Colorado v. Spring, 479 U.S. 564, 573 (1987). That is, the suspect must understand the nature of the Miranda rights and the general consequences of making a statement -- i.e., that it can be used to incriminate the suspect. See also, United States v. Bradshaw, 935 F.2d 295 (D.C. Cir. 1991) (valid waiver determined by

---

[12]    Miranda v. Arizona, 384 U.S. 436 (1966).

[13]    The government does not plan to introduce statements made by the defendant on March 19, 2008, during the execution of the search warrant. Although those statements were made freely and voluntarily, they were limited to the homicide. The defendant was not questioned at that time about the gun which officers found while executing the search warrant.

voluntariness of decision to waive and by whether the decision to waive was made with "full awareness" of "nature" of waived rights, and consequences of waiver) (without citations).

The evidence at hearing would show that the defendant has significant prior experience with the legal system. With respect to the statement he made after he was arrested, he was read his rights and waived them before he was interviewed. Where, as here, the defendant explicitly waived his rights, the defendant is hard-pressed to prevail on a claim of involuntary waiver. See North Carolina v. Butler, 441 U.S. 369, 373 (1979) (express waiver is strong proof of validity of the waiver); United States v. Yunis, 859 F.2d 953, 961-962 (D.C. Cir. 1988) ("[t]he administration of proper Miranda warnings, followed by a written waiver of the rights ... will usually go far toward demonstrating that a decision to speak is not compelled") (without citations).

### B.    The Defendant Voluntarily Waived His Miranda Rights, and His Statement was Voluntary.

The voluntariness of a Miranda waiver is assessed by a consideration of the same factors used to determined whether a statement is voluntary. A statement is voluntary for purposes of due process so long as the statement is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973). Moreover, for a statement to be involuntary, it must have been caused by government overreaching. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986) ("[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). In making this determination, a district court must examine "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. at 226. Relevant factors include: the youth of the accused; his

lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional

rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of

physical punishment such as the deprivation of food or sleep.  United States v. Rodney, 956 F.2d

295, 297 (D.C. Cir. 1992).

The evidence in this case does not in any way show that defendant's will was overborne.  The

defendant is a 37-year-old man with significant prior contacts with the legal system.  A hearing

would show that while the defendant, was in the interview room for 12.5 hours, he only spoke to

police for approximately 4.5 of these hours.  He was sober, alert, and in good physical condition.

He was offered food, given drinks and cigarettes, and permitted to smoke.  He was permitted to

spend one-half hour socializing with his girlfriend, Kimberly Miles.  He was not threatened or

abused during the interview.  He made numerous statements indicating his awareness that his

statements could be used to incriminate him.  For example, he acknowledged his understanding that

the police might be telling him "half-truths" to cause him to make incriminating statements.  He also

commented repeatedly on the fact that he was being recorded, and that he knew he could stop

speaking and ask for a lawyer.  There is simply no indication of coercive and overreaching conduct

by the police in this case.  Even if there were, there is no indication that under the totality of the

circumstances, defendant's will was overborne.

**C.    The Court Should Deny the Motion to Suppress Statements Without a Hearing.**

Contrary to the defendant's assertion that "the government bears the burden of pro[v]ing that

he was advised of his Miranda rights and knowingly and voluntarily waived them," as well as the

burden of proving that any statement make by a defendant was voluntary," (Motion at 5-6), it is the

defendant who bears the initial burden of making a prima facie that the police violated his rights:

> A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality. [citations omitted].  Reliance on vague, conclusory allegations is insufficient. A defendant must present "definite, specific, detailed, and nonconjectural" facts that justify relief before a district court will grant a suppression hearing. [citations omitted]. Additionally, these facts must be material, and they must be disputed. . . . [Defendant did not allege] that the agents used intimidation, force or threats of force, that they displayed weapons, or that they physically restrained [defendant] in any way whatsoever.

United States v. Randle, 966 F.2d 1209, 1212(7th Cir. 1992) (affirming district court's denial of motion to suppress statements without holding a hearing); see also United States v. Webb, 755 F.2d 382, 390 (5th Cir. 1985) ("the defendant bears the burden of demonstrating that statements which the defendant seeks to suppress were made while the defendant was under custodial interrogation"); United States v. Crocker, 510 F.2d 1129, 1135 (10th Cir. 1975) (when addressing a motion to suppress statements allegedly taken in violation of Miranda, court held that "Logic dictates that a pre-trial Motion to Suppress filed by the accused does in fact cast the burden upon the movant to present facts necessary to sustain his position."), overruled on other grounds, United States v. Bustillos-Munoz, 235 F.3d 505, 516 (10th Cir. 2000).

In this case, the defendant has failed to cite a single "definite, specific, detailed, and nonconjectural" disputed material  fact in support of his motion to suppress statements.  In fact, the defendant fails to cite any fact at all in support of his motion, other than the fact that "Mr. Williams made statements during the execution of the search warrant and after his arrest." (Motion  at 5.) Under these circumstances, the defendant's assertion that "the Court must examine the efforts to overbear Mr. Williams' free will in relation to his capacity to resist those efforts," (Motion at 6),  is wholly without merit.

WHEREFORE, for the reasons stated above, the United States respectfully requests that

the defendant's motion to suppress physical evidence and statements be denied.

Respectfully Submitted,


JEFFREY A. TAYLOR
Attorney of the United States in
and for the District of Columbia
Bar No. 498610


BY:    _____/s/_____
EMILY A. MILLER
Assistant United States Attorney
Bar No. 462077
Federal Major Crimes Section
555 4th Street, N.W., Room 4237
Washington, DC 20530
(202) 514-7533
Emily.Miller2@usdoj.gov

23

Exhibit A

PD 274  8/00

**METROPOLITAN POLICE DEPARTMENT**

Washington, D.C.

# Affidavit in Support of an Application for Search Warrant

☐ **United States**
**District Court**

☑ **Superior Court of the District of Columbia**

---

FOR THE ENTIRE PREMISES KNOWN AS 1830 MARYLAND AVENUE APARTMENT #3 N.E. WASHINGTON, D.C.  THIS LOCATION IS DESCRIBED AS A TWO STORY ATTACHED APARTMENT BUILDING, WHICH IS CONSTRUCTED WITH BRICK.  THE NUMBERS "1830" ARE BLACK IN COLOR AND ARE ATTACHED TO THE RIGHT OF THE FRONT DOOR ON WHITE IN COLOR DOOR TRIM.  THE FRONT ENTRY DOOR IS WHITE IN COLOR WITH CLEAR GLASS WINDOW PANES. APARTMENT #3 IS ON THE SECOND FLOOR OF THE APARTMENT BUILDING AND APARTMENT #3'S DOOR IS AN OFF-WHITE/TAN IN COLOR WITH THE SAME COLOR DOOR KNOCKER IN THE CENTER WITH THE NUMBER "3" ON IT. A SILVER COLORED DOOR KNOB AND DEADBOLT ARE ON THE RIGHT SIDE OF THE DOOR.

1.  Your Affiant in this matter, Detective Douglas Carlson, has been a police officer with the Metropolitan Police Department since 1996.  In 2001, your Affiant was promoted to the rank of Investigator and in 2002 your Affiant was promoted to the rank of Detective Grade II, and is currently serving at this rank.  During your Affiant's tenure with the Metropolitan Police Department he has been assigned to the Fifth District Uniform Patrol Division, assigned to the Youth & Preventive Services Division, Family Violence & Child Protection Unit, and is currently assigned to the Violent Crimes Branch, Homicide Unit.  Your Affiant has received training to include but not limited to the following areas:  Basic Death Investigators Course, Robbery & Burglary Investigation Training, Family Violence & Child Protection, Basic Investigators Course, Forensic Interview Course and Interview and Interrogation Courses.  Your Affiant has made numerous arrests and interviewed numerous victims, witnesses and suspects.  Your Affiant has participated in numerous criminal investigations.

2.  On Tuesday, November 1, 2005, at approximately 0545 hours, members of the D.C. Fire & E.M.S. (Engine #08 and Medic #08) received a radio assignment for a vehicle fire in front of 1210 19th Street N.E. Washington, D.C.  Once on the scene, the members discovered a 1999 GMC Yukon, bearing D.C. hard tags of BX-7490 on fire.  While extinguishing the fire, members discovered the decedent, Reginald Anthony Holmes in the rear passenger's seat suffering from multiple gunshot wounds to the head and body.  At this time, members of Medic #08 transported the decedent to Washington Hospital Center, Med-Star for medical treatment.  Med-Star staff members attempted to render life saving measures with negative results.  The decedent was then pronounced dead at 0626 hours, by Dr. Williams of staff.  The decedent's remains were subsequently transported to the D.C. Medical Examiner's Office pending an autopsy.

3.  On Wednesday, November 2, 2005, Dr. Pierre-Louis, Chief Medical Examiner for the District of Columbia preformed an autopsy of the decedent's remains.  The autopsy revealed that the decedent had been shot eleven (11) times.  The decedent

---

_____
Affiant

_____
United States Attorney

VCB - Homicide Unit
_____
Element

Subscribed and sworn to me this __13th__ day of __March__, __2008__

_____
Magistrate
United States District Court

_____
Judge
Superior Court of the District of Columbia

PD 274  8/00

**METROPOLITAN POLICE DEPARTMENT**

Washington, D.C.

# Affidavit in Support of an Application for Search Warrant

☐ **United States District Court**

☑ **Superior Court of the District of Columbia**

---

suffered two (02) gunshot wounds to the head, and nine (09) gunshot wounds to the lower torso. During the autopsy of the decedent, several pieces of physical evidence were recovered to include, but not limited to; five (05) bullet slugs from the decedent, a piece of flat metal, three bullet fragments, and a piece of fiber material were also recovered from the decedent.

4. During the processing of the crime scene and processing of the decedent's vehicle members of the Mobile Crime Laboratory recovered physical evidence to include, but not limited to; twelve (12) .40 S&W cartridge casings, six (06) bullet slugs, multiple latent prints (finger and palm prints) and a latent boot impression.

5. During the investigation into the decedent's murder, the recovered firearm evidence was submitted for examination to the Metropolitan Police Department's Firearms Examination Section. As a result of this examination, it was determined that all of the twelve (12) .40 S&W cartridge casings (Federal, PMC, and Speer brands) were fired from the same firearm. It was also determined that all eleven (11) of the .40 S&W bullet slugs were fired from the same barrel. Your Affiant was notified about the results of this examination on Saturday, February 04, 2006.

6. On Sunday, February 19, 2006, at approximately 1815 hours, members of the First District arrested a subject by the name of, Vincent Damion Panell, DOB 11/11/1986, Black Male, SOC# 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, PDID# 521-974, of 4365 Benning Road N.E. Washington, D.C. for UCSA PWID Cocaine while Armed. The defendant was arrested in the 1500 Block of Potomac Ave. S.E., pursuant to a traffic stop and found to be in possession (on his person) of a Glock Model #22 .40 S&W caliber handgun. This handgun was loaded with one (01) live round in the chamber and (13) thirteen live rounds in the magazine. As a result of the recovery of this firearm, it was submitted to the Metropolitan Police Department's Firearm Examination Section for examination. As a result of this examination, it was determined that the Glock Model #22 .40 S&W caliber handgun recovered from the defendant was matched as being the same firearm that was used to murder the decedent.

7. During your Affiant's investigation into this matter, I learned that members of the Metropolitan Police Department's First District executed a D.C. Superior Court Search Warrant at Mr. Panell's home on Tuesday, February 28, 2006. As a result of this search, members of the First District recovered the following physical evidence to include but not limited to; thirty-eight (38) live rounds of ammunition, a firearm case, and firearm lubricant. At the conclusion of this search, Mr. Panell was arrested again and charged with UCSA Possession of Crack Cocaine, Possession of Unregistered Ammunition, and Possession of Drug Paraphernalia.

_____
Affiant

_____
United States Attorney

VCB - Homicide Unit
_____
Element

---

Subscribe and sworn to me this _13th_ day of _March_, _2008_

_____
Magistrate
United States District Court

_____
Judge
Superior Court of the District of Columbia

PD 274 8/00

**METROPOLITAN POLICE DEPARTMENT**

Washington, D.C.

# Affidavit in Support of an Application for Search Warrant

☐ **United States District Court**

☑ **Superior Court of the District of Columbia**

---

8. On Monday, March 6, 2006, your Affiant presented and obtained a D.C. Superior Court Search Warrant for Mr.Panell's home address of 4356 Benning Road N.E. Washington, D.C. This Search Warrant was obtained in an attempt to locate Boots/Footwear with the same type of impression recovered from the decedent's vehicle, Clothing/Footwear with blood on it, cellular telephones and other communication devices that could link Mr. Panell to the decedent's murder, and mail matter, photographs, identification, and paperwork that showed ownership and residency of Mr. Panell's home address.

9. In March of 2006, your Affiant submitted a request to have Mr. Panell's known prints compared to the latent prints recovered from the decedent's truck. This examination was completed and no match was made from Mr. Panell's known prints to the latent prints recovered from the decedent's truck.

10. On Tuesday, March 7, 2006, your Affiant and members of the Metropolitan Police Department executed this D.C. Superior Court Search Warrant at Mr. Panell's residence. During this search evidence was recovered to include; assorted photographs, assorted papers, assorted cellular telephones, a pair of Tan in color Timberland boots, an additional single (left) Tan in color Timberland boot, a live 9mm bullet, and a pair of Blue jeans.

11. In May of 2006, the pants and boots recovered from Mr. Panell's residence were examined by members of the Federal Bureau of Investigation's Evidence Laboratory in an attempt to link any of this evidence to the decedent's murder. To date no link has been made to connect these items to the decedent or the decedent's murder.

12. Recently, your Affiant interviewed a witness, (hereinafter W-1) about the decedent's murder. During this interview W-1 reported, that IT and the decedent had been friends for a long time and that IT is close with the decedent's family. W-1 reported IT has information about the decedent's case that IT thinks that I should know. W-1 reported that the decedent and "Roger" (Reginald Washington) were best-friends and that they were always together. W-1 reported that the decedent and "Roger" would hang out in the area of 12th & Jackson Street N.E. and that "Roger" and the decedent would always be riding around in "Roger's" fancy vehicles. W-1 reported that IT would be in the area also and that a subject by the name of "Tim" would sometimes be in the area. W-1 reported that "Tim" was a hard core criminal who would rob people. W-1 went on to report that "Tim" would observe the decedent and "Roger" driving and hanging around and "Tim" would

_____
Affiant

_____
United States Attorney

VCB - Homicide Unit
_____
Element

Subscribed and sworn to me this __13th__ day of __March__, __2008__

_____
Magistrate
United States District Court

_____
Judge
Superior Court of the District of Columbia

# Affidavit in Support of an Application for Search Warrant

☐ **United States
District Court**

☑ **Superior Court of the District
of Columbia**

comment on how they must have money and how he (Tim) was going to get at them. W-1 reported that IT would make little comments telling "Tim" that the decedent was small time and that the decedent did not have any money. W-1 reported that IT was trying to get "Tim" not to rob the decedent and "Roger", but IT was not trying to get himself hurt either. W-1 reported that "Tim" is crazy and that if IT said too much, "Tim" might shoot IT. W-1 went on to report that after the decedent was murdered, that "Tim" would try to contact IT to see what people were saying, but that IT (W-1) would avoid "Tim". According to W-1, IT does not want to be involved in this investigation and possibly be caught in the middle of all of this. W-1 reported that a little while after the decedent's murder, IT came into contact with "Tim" and that "Tim" started talking to IT. W-1 went on to report that during this conversation that IT asked "Tim" why he did that (meaning shoot and kill) to the decedent and "Tim" said words to the effect that he was just trying to get the decedent to take him to "Roger", but the decedent refused and bucked. W-1 reported that "Tim" said that the decedent resisted and he (Tim) shot him. W-1 reported that "Tim" told IT that after the decedent was shot, the decedent kept resisting and that he shot him some more, killing him. After this, I asked W-1 to describe "Tim" to me and IT reported that "Tim" was a dark skinned Black Male, 6'00" tall, who lives somewhere in the area of 21st Street & Maryland Avenue N.E. Washington, D.C. W-1 reported that "Tim" drives two cars, one being a two-door Red Chevy Monte Carlo and the other being a two-door Black Chevy Monte Carlo. W-1 also reported that IT knows "Tim's" last name, but IT could not recall it right now. At this time, I asked W-1 if IT would be able to recognize "Tim" from a photograph and IT reported that IT could. At this time, I ran numerous computer checks on "Tim's", which live in the area of 21st Street & Maryland Avenue N.E. Washington, D.C. While running these checks, I discovered a subject by the name of Timothy Lionel Williams, who lives at 1830 Maryland Ave. Apt# 03 N.E. and his physical description matched the description that W-1 provided At this time, W-1 and I looked through COLOMBO for arrests in the Fifth District with the first name "Tim". Assorted "Tim's" with assorted last names appeared on the screen (I was attempting to see if W-1 would recall "Tim's" last name), that including Timothy Williams. At this time W-1 pointed to the name Timothy Williams and stated that "Tim's" last name was "Williams". I then clicked on this subject and pulled up the photograph of Timothy Lionel Williams, 06/23/1970, PDID 386-595. Upon seeing this photograph, W-1 stated, "That's Tim". I then asked W-1 if that was the "Tim" IT was talking to me about and W-1 advised me, "Yes".

13. In January of 2008, your Affiant submitted a request to have Mr. Williams and W-1's known prints compared to the latent prints recovered from the decedent's truck. This examination was completed with no match from Mr. Williams or W-1's known prints to the latent prints recovered from the decedent's

_____
Affiant

_____
United States Attorney

_VC-B - Homicide Unit_
_____
Element

Subscribed and sworn to me this __13-th__ day of __March__, __2008__

_____
Magistrate
United States District Court

_____
Judge
Superior Court of the District of Columbia

PD 274  8/00

**METROPOLITAN POLICE DEPARTMENT**
Washington, D.C.

# Affidavit in Support of an Application for Search Warrant

☐ **United States District Court**

☑ **Superior Court of the District of Columbia**

---

truck.

14. After learning this information, your Affiant conducted assorted computer checks on Mr. Williams and learned that Mr. Williams possesses a valid D.C. Driver's Permit listed to the address of 1830 Maryland Avenue N.E. Washington, D.C., an Accurint search was run on Mr. Williams which shows that he carries an address of 1830 Maryland Avenue Apartment #3 N.E., and a vehicle registration search revealed that Mr. Williams had a 2004 Chevrolet passenger car registered to him in December of 2005, at 1830 Maryland Avenue Apartment #3 N.E. Washington, D.C. It should also be noted that the 1200 Block of 19th Street N.E. Washington, D.C. (the location were the decedent and the decedent's truck were found) is approximately four to five short city blocks away from 1830 Maryland Avenue Apartment #3 N.E. Washington D.C.

15. Based on the aforementioned facts and circumstances, your Affiant believes probable cause exists that evidence in the decedent's murder case could be contained inside of 1830 Maryland Avenue, Apartment #3 N.E. Washington, D.C. Furthermore, your Affiant respectfully requests that a D.C. Superior Court Search Warrant be issued, permitting the Metropolitan Police Department to search the said premises for Boots/Footwear with the same type of impression recovered from the decedent's vehicle, Clothing/Footwear with blood on it, mail matter, photographs, identification, and paperwork that show ownership and residency of these items and the apartment.

_____
Affiant

_____
United States Attorney

_____
VCB-Homicide Unit
Element

Subscribed and sworn to me this _____ day of _____ , 2008

_____
Magistrate
United States District Court

_____
Judge
Superior Court of the District of Columbia